**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Cassius CARTER, Defendant-Appellant.**

**No. 72–3732.**

United States Court of Appeals, Fifth Circuit.

March 22, 1974.

Fred C. DeLong, Jr., (Court-appointed), L. Carl Hagwood, Greenville, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Norman L. Gillespie, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before TUTTLE, BELL and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Defendant Cassius Carter was convicted in federal district court on two counts of violating the Dyer Act [1] by receiving and concealing two stolen automobiles which had moved in interstate commerce from Chicago, Illinois to Washington County, Mississippi. On this appeal defendant alleges that the trial court erred: 1) in excluding as hearsay defendant's testimony regarding a conversation with the party from whom he claims to have received one of the stolen automobiles; and 2) in delivering a prejudicial supplementary charge to the jury on circumstantial evidence. We find merit in both of these contentions and hold that the district court's supplemental instructions so prejudiced defendant's right to a fair trial as to require a remand for a new trial on both counts of the indictment. We therefore reverse.

---

1. 18 U.S.C. § 2313. Sale or receipt of stolen vehicles.

Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**A.** *Count I, 1968 Pontiac Catalina.* Count I of the indictment charged that on or about May 18, 1972, Cassius Carter received and concealed a stolen 1968 Pontiac Catalina automobile, which had moved in interstate commerce from in or near Chicago, Illinois to Washington County, Mississippi, knowing the automobile to have been stolen. The government established that the Catalina had been stolen from a Chicago street in February 1972. Defendant was stopped and arrested while driving the automobile in Washington County, Mississippi in May 1972. He presented an Illinois drivers license in the name of "Earl W. Bratcher." At the time of the arrest the stolen automobile bore a stolen Mississippi license plate, which had been taken from another car in March 1972.

Defendant claimed that he had secured the Catalina from his cousin, David Carter, who had given defendant permission to use the automobile in return for making needed repairs until David returned from a trip to California. Defendant denied having any knowledge that either the automobile or the license plates were stolen.

**B.** *Count II, 1971 Pontiac GTO.* Count II of the indictment charged that on or about August 7, 1971, defendant received and concealed a stolen 1971 Pontiac GTO, which had moved in interstate commerce from in or near Chicago, Illinois to Washington County, Mississippi, knowing the automobile to have been stolen. The stolen automobile belonged to one Earl W. Bratcher, who testified that his Illinois driver's license and title certificate were in the glove compartment of the car at the time of the theft. During the summer of 1971 defendant was employed as a dump truck operator under the name of Earl W. Bratcher, and he used the Earl W. Bratcher driver's license during the course of his employment. Defendant was arrested in August 1971 in Greenville, Mississippi in possession of the stolen GTO.

Defendant testified that he had obtained the car from a friend whom he knew by the name of Earl Bratcher. He described this Bratcher as a Negro male, approximately 27 years old—not the Earl W. Bratcher who testified at the trial and identified himself as the owner of the stolen GTO. Defendant claimed to have lent money to his acquaintance Bratcher on two or three occasions, which he assumed was the reason Bratcher had lent him the car. According to defendant's testimony, Bratcher had informed him that he was unable to get his car out of the repair shop because he was out of money, and that if defendant would get the car and repair it, he could use it while Bratcher was out of town. Because defendant did not have a driver's license, Bratcher gave him permission to use his license as well as the title to the GTO.

To summarize the evidence on both counts of the indictment, the government demonstrated clearly that defendant had received the two automobiles, both of which had been stolen and both of which had moved in interstate commerce. The only element of either offense subject to dispute was whether defendant knew the automobiles to have been stolen. The jury had primary responsibility for making that critical determination and thus for weighing the evidence and making credibility choices. Therefore, the evidence the jury was permitted to hear and the instructions as to how the jury should evaluate that evidence were critical to the fairness of the trial.

## THE HEARSAY EXCLUSION

Defendant first argues that the trial court erred in excluding testimony offered by defendant regarding conversations with his cousin, David Carter, about the 1968 Pontiac Catalina, the subject of Count I of the indictment. After his arrest defendant was interviewed at the Greenville, Mississippi city jail by FBI Agent John Neeley. Agent Neeley obtained an oral statement from defendant concerning his possession of the stolen Catalina, including his

alleged receipt of the car from cousin David Carter. At trial Agent Neeley testified from his typewritten report of the statement.[2]

■ When defendant took the stand later in the trial, he sought to give his own account of his receipt of the car from David Carter. The district court permitted defendant to testify about "what happened," but refused to allow him to testify about his conversations with David Carter at the time of the transaction on the ground that such testimony would be "hearsay evidence." The excluded testimony, however, did not fall within the hearsay rule at all, and the district court erred in sustaining the government's objection to the testimony on that basis.

■ Application of the hearsay rule and its various exceptions presents one of the most treacherous tasks in the law of evidence; but the most fundamental element of the hearsay rule is the critical distinction between the testimonial or assertive use of human utterances and their non-testimonial use:

> The theory of the Hearsay rule is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extra-judicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted,* the Hearsay rule does not apply.

6 Wigmore, Evidence (3d ed.) § 1766 (emphasis in original). The bases for the distinction are the very reasons for the hearsay rule itself: 1) the out-of-court declarant generally speaks without the solemn oath administered to in-court witnesses; 2) the trier of fact has no opportunity to observe the demeanor of the out-of-court declarant; and 3) the adversary has no opportunity to cross-examine the absent declarant whose statement is reported by the witness. All of these reasons for the rule vanish when the credibility of the out-of-court asserter and the veracity of his statements are not at issue.

In the conversations about which defendant sought to testify, neither the credibility of the absent declarant, David Carter, nor the truth of the matters he asserted was relevant to the proceeding. Defendant wanted to relate the conversations in order to bolster his claim that he had no knowledge that the Pontiac Catalina allegedly obtained from his cousin was stolen. Whether or not defendant knew the automobile was stolen might have depended on what his cousin told him; it could not have depended on whether his cousin was telling

---

2. Agent Neeley's testimony was as follows:

"Considering this particular matter and point, Carter advised that he was arrested by an officer of the Hollandale, Mississippi Police Department early on the morning of May the 18th, 1972, at which time he was in possession of a 1968 Pontiac, which did bear a Mississippi license plate and a current Mississippi inspection sticker.

"He advised that this arrest occurred on Old Highway 61 North, within the City Limits of Hollandale.

"He advised that he obtained this Pontiac automobile approximately two months before that time from a cousin, David Carter.

"He stated that he could furnish no information as to how David Carter could be located, or anyone who would know his whereabouts, or the whereabouts of any of David Carter's immediate family.

"He stated that he paid no money for this car and did not agree to rent it or purchase it.

"He stated that David Carter left it with him, claiming that he was going to California and did not want to tow this car to that State.

"Carter advised that David Carter advised him that he could get the dents out of the car and could use it until he returned.

"Cassius Carter advised that he was in Chicago, Illinois from the middle of December 1971 until the middle of January 1972.

"He stated at that time he did not steal the 1968 Pontiac or transport it to the State of Mississippi, and did not have knowledge that the vehicle was stolen." (Transcript, pp. 63–64).

him the truth. If defendant had been allowed to tell his story as he wished, the jury would have been faced, not with the issue of David Carter's credibility, but with assessing the credibility of Cassius Carter, who was under oath and subject to cross-examination.

■ The government does not argue on this appeal that defendant's testimony fell within the hearsay exclusion. Rather the government takes the position that the trial court's error, if any, was harmless, because defendant was not prevented from submitting his explanatory evidence in the presence and hearing of the jury. The trial transcript reveals that defendant was able to testify about the substance of the transaction with his cousin. In response to questions on direct and cross-examination, defendant explained: that David Carter had towed the car to Mississippi from Illinois; that David left the car with defendant, and went on to Jackson and then to California; that the car had some dents in it and did not run very well; that David and Cassius agreed that Cassius would repair the car and keep it until David could get back from California; and that David returned to Hollandale, Mississippi to pick up the car, but left when he learned that Cassius was in jail because of the car. In view of this testimony the government argues that the trial court's evidentiary ruling did not impair defendant's substantial rights and thus did not constitute reversible error. Fed.R.Crim.P., Rule 52(a).

Defendant responds that, although questioning revealed certain elements of the transaction, he was nevertheless prevented from explaining to the jury in his own words what his cousin told him when he turned over possession of the stolen Pontiac Catalina. It is clear that defendant's responses to questions, some by his own counsel and some by the prosecutor, spread intermittently over some thirty pages of transcript, lacked the coherence and continuity that would have been possible in a straightforward recitation of his story. It is equally clear that defendant's explanation of his possession of the stolen automobile was a critical element in his defense. The government had proved that the 1968 Catalina and the 1971 GTO had been stolen, that both cars had moved in interstate commerce, and that both were in Cassius Carter's possession. To obtain a conviction the government needed only to establish that, at the time he took possession of the automobiles, defendant knew that they had been stolen. *See* United States v. Brady, 8 Cir. 1970, 425 F.2d 309; Powell v. United States, 5 Cir. 1969, 410 F.2d 710. This Court has held that the requisite knowledge that a vehicle has been stolen "may be established by circumstantial evidence and that possession of a stolen vehicle recently after its theft justifies the inference that the possession is guilty possession. This evidence may be of controlling weight unless it can be explained in some way consistent with innocence." Welch v. United States, 5 Cir. 1967, 386 F.2d 189. Defendant argues that the trial court's exclusion of his testimony regarding his conversations with David Carter could not be considered harmless, because it deprived him of his only defense by impairing his opportunity to explain his possession of the stolen Pontiac Catalina "in some way consistent with innocence."

On the basis of this Court's recent decision in United States v. Paquet, 5 Cir. 1973, 484 F.2d 208, we conclude that the trial court's error in excluding Cassius Carter's proposed testimony as hearsay cannot be considered harmless. In *Paquet* the Court determined that the district court had erroneously excluded as hearsay defendant Paquet's testimony as to the content of certain conversations between himself and the government informer, Lewis Christian, from which he hoped to demonstrate entrapment. Writing for the panel majority Judge Coleman held, without discussion of harmless or prejudicial error, that the district court's refusal to accept the testimony required reversal. 484 F.2d at

212. In a special concurring opinion Judge Gewin noted two particular features of Paquet's trial that highlight its similarity to the trial of Cassius Carter: 1) the exchange about which Paquet sought to testify constituted the exclusive basis for his entrapment defense; and 2) Paquet had an opportunity in another context (examining Christian) to expose those aspects of their exchange that supported his entrapment defense. Judge Gewin concurred in the finding of reversible error, emphasizing that:

> Courts are particularly reluctant to deem error harmless where, as here, the error precludes or impairs the presentation of an accused's sole means of defense. Nor can the errors be considered harmless under the putative theory that by availing himself of the opportunity to elicit testimony from Christian concerning those aspects of the conversation most favorable to his defense, Paquet could have fully exposed his position to the jury. In my view, a surrogate explanation by Christian, a government witness, would be an inadequate substitute for Paquet's own testimony, where Paquet's own testimony was curtailed without explanation to the jury as to the reasons therefor while the government's evidence on the same matter was permitted.

484 F.2d at 214 (concurring opinion). We are satisfied that Cassius Carter's "surrogate explanation," coming as it did in piecemeal answers to intermittent questions, was an "inadequate substitute" for the uninterrupted account of the conversations he sought to present. The trial court's exclusion of that account was reversible error.

█ Of course, defendant Carter's assignment of error on the exclusion of testimony as hearsay relates only to Count I of his two count indictment. Defendant received concurrent sentences of two years on each count. Because defendant's second assignment of error—that the trial court's supplemental instruction to the jury on circumstantial evidence was prejudicial—involves the validity of his conviction on both counts of the indictment, its resolution ordinarily would render consideration of the narrower objection unnecessary.[3] We have given extensive consideration to the hearsay error in this case, however, because of the likelihood that the issue might arise once again if the government elects to reprosecute defendant. In any subsequent trial under the first count of this indictment, Cassius Carter should be permitted to testify in full and in his own words as to what David Carter told him about the 1968 Pontiac Catalina, so long as such testimony is offered without reference to the truth of the matter asserted.

## THE SUPPLEMENTAL CHARGE

Defendant's second argument on this appeal is that the trial court erred in its supplemental charge given in response to the jury's written request for a definition of "circumstantial evidence." In its initial charge to the jury, covering some 28 pages of transcript, the court gave the following instructions regarding circumstantial evidence:

> There are two types of evidence from which a jury may properly find a defendant guilty of a crime. One is direct evidence—such as the testimony of an eyewitness. The other is circumstantial evidence—the proof of a chain of circumstances pointing to the commission of the offense.
>
> As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case. (Transcript, pp. 294–95)

In addition, the court commented fairly and properly on the evidence that the

---

3. *Cf.* Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. For a discussion of the current applicability of the "concurrent sentence doctrine" see Benton v. Maryland, 1969, 395 U.S. 784, 787–791, 89 S.Ct. 2056, 23 L.Ed.2d 707.

only question that remained for the jury to decide was "whether or not this defendant knew or had knowledge of the fact that these automobiles were stolen when he received or concealed them . . . ." (Transcript, p. 311). As to the inferences that the jury might draw, the court charged:

Possession of property, recently stolen, if not satisfactorily explained, is a circumstance from which the jury may reasonably draw the inference and find that the person in possession knew the property had been stolen.

Possession in one state of property recently stolen in another state, if not satisfactorily explained, is a circumstance from which the jury might reasonably infer and find in the light of surrounding circumstances that a person in possession not only knew it to be stolen property, but also that such person received or concealed the property while moving in interstate commerce. The same inferences may be reasonably drawn from a false explanation of possession of recently stolen property. (Transcript, pp. 307–08)

\* \* \* \* \* \*

Now, it is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence warrant any inference which the law permits the jury to draw from possession of recently stolen property. If any possession the accused may have had of recently stolen property is consistent with innocence or if you entertain reasonable doubt of guilt, then the jury should acquit the accused. (Transcript, p. 309)

Of course, the court also gave the standard series of general instructions to the jury, and several other special instructions called for under the circumstances of this case.

At 4:35 p. m. the jury retired to commence their deliberations. At 6:15 p. m. the jury returned to the courtroom and submitted the following written request to the court: "We would like circumstantial evidence clarified for us."

The trial judge discussed the request in chambers with counsel for defendant and with counsel for the government. The judge expressed his intention to repeat that portion of his original charge relating to circumstantial evidence and noted that he "might ad-lib on it." Then, in open court, the judge delivered the following supplemental instruction to the jury in response to its inquiry:

"I am going to give you another instruction on this, which is similar to the one that I gave you in my charge, and then I am going to try to give you an illustration or two which might further clarify it for you; to explain to you the difference between direct evidence and circumstantial evidence, which may help you in determining the law and clarifying the law for you.

"A defendant may be proven guilty by either direct or circumstantial evidence. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant.

"The law makes no distinction between the weight to be given to either direct or circumstantial evidence; it requires only that the jury, after weighing all the evidence, must be convinced of the guilt of the defendant beyond a reasonable doubt before he can be convicted.

"Now, by these illustrations, I want you to take what I say as an illustration between direct and circumstantial evidence. We will take a case of unlawful homicide, or a charge of unlawful homicide. We have a direct witness who is in a room with two people, and while that witness is in the room there becomes a controversy or conflict between the two persons. That witness then leaves the room.

"While that witness was in the room and has actually been in contact with these two people, can testify from actual knowledge, from eyewitness testimony, that the two people were in the room at

the time and that they were engaged in a controversy.

"After that witness leaves the room, goes to another part of the building, or goes out in the yard, we will say, then that person hears a gun fire, and from the building emerges one of the people whom he or she saw in this room.

"Now, of course that witness would not be able to testify that the gun was actually fired, or that the person was actually killed by the gun. But, if she goes into the room and sees the person that she saw in the room to start with on the floor, dead, with blood on him, and the other person running with the gun from the building, those would be circumstances which would justify the jury in finding, from circumstantial evidence that the person with the gun actually fired and killed the person that was dead in the room.

"That would be one illustration of circumstantial evidence.

"Another instance of circumstantial evidence will take into consideration the crime of burglary and larceny. For instance, if you had a radio in your home, at night, and someone broke in the front door and entered the room and stole the radio and left with it, all unbeknownst to you, and the next morning you found that the door was broken down, and that the radio was gone, and then later on that day, or some time within recent time, that radio was found in the possession of another person.

"Then those are circumstances which might justify you in believing, beyond a reasonable doubt, and to a moral certainty that the person who had possession of the radio was the person who broke into the house and stole it, unless that person made a satisfactory explanation of the manner in which he came into possession of the radio, or your radio, which was in his possession after the radio had been stolen.

"Now, if you would have had somebody there present that actually could see the person breaking into the house, and actually see them pick up the radio, and actually see them leaving with the radio from the house, that would be an actual eyewitness, direct testimony. But, if no one was there present, the fact that the radio was in the home and the door was locked on the night before, the next morning the door was broken in, the radio was gone, and later on, within a reasonable period of time, the radio was found in the possession of a person, then in the absence of some satisfactory explanation of how he came into possession of it, then you might find from that circumstantial evidence, just as you could on direct evidence, that the person actually broke into your home and stole your radio.

"Now, those are illustrations of the difference between direct evidence and circumstantial evidence.

"And, as I have said, leaving aside the explanations that I have given, and reading to you again the instruction with reference to direct and circumstantial evidence; direct evidence is the testimony of one who actually asserts—asserts actual knowledge of a fact, such as an eyewitness; circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant.

"And, as I have said, the law makes no distinction between the weight to be given to either direct or circumstantial evidence; the law only requires that the jury, after weighing all the evidence, must be convinced of the guilt of the defendant beyond a reasonable doubt before he can be convicted." (Transcript, pp. 330–33)

Immediately after this new charge was given, the jury was escorted to dinner at 6:55 p. m. The record does not indicate what time the jurors returned from dinner to continue their deliberations, but at 9:07 p. m. they reentered the courtroom and presented verdicts of "guilty" on both counts.

Defendant's claim that the supplemental charge unduly prejudiced the jury rests on the alleged impact of the two illustrations offered by the court to dem-

onstrate the difference between direct evidence and circumstantial evidence. Defendant argues that these examples, which constituted approximately two-thirds of the charge, were defective: 1) because both pointed toward guilt of the accused, and no examples were offered that would be consistent with innocence of the accused; 2) because the second example incorporated an instruction on the inferences that can be drawn from unexplained possession of recently stolen property, without a corresponding instruction on the defenses available to one who is found in possession of such property; and 3) because the second example—regarding burglary and larceny—may have confused the jury as to the nature of the charges against the defendant, leading them to believe that he was on trial for theft of the automobiles in question.

█ In evaluating supplemental instructions to a jury, appellate courts are guided largely by lofty, but very general, propositions and admonitions. We know, for example, that when a jury expresses confusion and difficulty over an issue the trial court has an obligation to "clear them away with concrete accuracy." Bollenbach v. United States, 1946, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354. Supplemental instructions, as well as instructions given prior to commencement of jury deliberations, must be considered as a whole, and not word-by-word or phrase-by-phrase. United States v. Jackson, 5 Cir. 1972, 470 F.2d 684, 688. Moreover, a supplemental charge ordinarily must be viewed in the light of other instructions already given. Perez v. United States, 5 Cir. 1961, 297 F.2d 12, 16.

However, the words, phrases, and paragraphs of a judge's response to a question raised by the jury after a period of deliberation cannot reasonably be considered as merely additional language in the basic charge. As Mr. Justice Frankfurter wrote for the Supreme Court in Bollenbach:

Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge.

326 U.S. at 612, 66 S.Ct. at 405. When after an hour and 40 minutes of deliberation a jury returns, not with a verdict, but with a request for clarification of a particular point of law, it must be recognized that the jury has been unable to reach a decision on the basis of all it has heard up until that time. Under those circumstances a trial judge must be acutely sensitive to the probability that the jurors will listen to his additional instructions with particular interest and will rely more heavily on such instructions than on any single portion of the original charge. Thus, the court must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial.

█ In the present case, considering all instructions to the jury in their proper perspective, we cannot say that the supplemental charge met the high standard of balance and fairness necessary to assure defendant a fair trial. In its "ad-lib" remarks to the jury, after repeating the distinction between direct and circumstantial evidence, the court recited two illustrations, both of which pointed toward the guilt of the accused. In the course of posing the second illustration, the court twice informed the jury that it could infer guilt from possession of recently stolen property, unless such possession was satisfactorily explained. This went beyond a mere instruction on "circumstantial evidence"; the effect of that portion of the supplemental charge was to reemphasize to the jury the part of the instruction on "possession" and "inferences" that was favorable to the government, without mentioning the part favorable to the accused (i. e., that if any possession the accused may have had of recently stolen property

is consistent with innocence, then the jury should acquit the accused).

■ This Court has clearly established the principle that

> when the jury requests further instructions on points which are favorable to the Government, the trial judge should repeat instructions favorable to the defense where the requested instructions taken alone might leave an erroneous impression in the minds of the jury.

Bland v. United States, 5 Cir. 1962, 299 F.2d 105, 108. *See also* Perez v. United States, 5 Cir. 1961, 297 F.2d 12. In the present case the instructions requested by the jury were not inherently favorable to either side; but the trial court went beyond the request to provide additional instructions strongly emphasizing the theory of the prosecution. *See* United States v. Diamond, 5 Cir. 1970, 430 F.2d 688, 697. Upon proper objection by defense counsel, the court, either through additional illustrations or through repetition of earlier instructions, should have reminded the jury of the defenses available to one who is in possession of recently stolen property.

The error in the court's supplemental charge is magnified by the unfortunate similarity between the example relating to "burglary and larceny" and the crime of receiving stolen property, with which Cassius Carter was accused. Both in the case before the jury and in the court's hypothetical fact situation an accused was in possession of recently stolen property. Regarding the hypothetical situation, the court instructed the jurors that, absent a satisfactory explanation, they would be justified in believing "beyond a reasonable doubt, and to a moral certainty that the person who had possession of the radio was the person who broke into the house and stole it . . . ." Cassius Carter's alleged conduct conformed to the facts of the hypothetical, but he could not have been convicted of burglary and larceny under his indictment. While we are convinced that the court intended no prejudice to the accused in its choice of examples, we are equally certain that this particular illustration was confusing and misleading.

Although this is a close case, we must reverse the judgment below and remand for further proceedings because we have been unable to assure ourselves that the trial judge did not inadvertently ad lib the defendant into a guilty status. We cannot sanction a conviction if there be a reasonable possibility that the robed judge by his words, no matter how innocent, implied guilt. We recognize that the trial judge's duties, like those of the constabulary, are not easy ones; we also are aware of the limitations of our cloistered view. Nevertheless, having examined the evidentiary ruling and the supplemental charge, we believe that the jury might have convicted defendant—not out of conviction based on all proper and relevant testimony, and under the guidance of accurate, precise, and balanced instructions—but because of an honest misinterpretation of judicial words. An accused is entitled to more.

Reversed and remanded.