**UNITED STATES of America, Appellee,**

v.

**Jonathan B. KOHAN and Daniel Lowery, Defendants-Appellants.**

**No. 1518, Dockets 86–1169, 86–1192.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 12, 1986.
Decided Nov. 17, 1986.

Joseph J. Marcheso, New York City, for defendant-appellant Kohan.

Howard T. Diller, New York City, for defendant-appellant Lowery.

Linda Imes, New York City, Asst. U.S. Atty. for S.D. of N.Y. (Rudolph Giuliani, U.S. Atty. for S.D.N.Y., of counsel), for appellee.

Before PRATT and MINER, Circuit Judges, and RE, Chief Judge of the United States Court of International Trade, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Jonathan B. Kohan and Daniel Lowery appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, following a joint five-day jury trial before Chief Judge Constance Baker Motley, of conspiracy to commit bank fraud, 18 U.S.C. § 371, and of the underlying substantive offense of making false and fraudulent representations in defrauding a bank, *id.* §§ 2, 1344. The evidence tended to show that Steven Fellouris, a co-defendant who was a fugitive at time of trial, solicited and received defendants' assistance in inducing Chemical Bank in New York to cash two corporate checks he had stolen from his employer and forged.

On appeal defendants urge several grounds for reversal, two of which center on evidentiary rulings by the trial judge and have substantial merit. As discussed below, the trial judge erred both in excluding the testimony of Lowery's sole witness on hearsay grounds and in precluding Kohan from cross-examining government witnesses regarding a possible scheme by Fellouris and his employer to defraud Chemical Bank. Because we believe these rulings served to prejudice substantial rights of Kohan and Lowery, we reverse and remand for a new trial.

## BACKGROUND

In February 1985 Fellouris, an employee of Brook Fuel Oil Corporation ("Brook Fuel"), devised a scheme to bilk Brook Fuel of $143,500. On February 26, 1985, Fellouris stole three checks payable to Brook Fuel in the aggregate amount of approximately $127,000, and deposited them into

the company's account with Chemical Bank without recording them on the company's books. Fellouris then stole a sheet of blank checks from Brook Fuel's checkbook, filled in two of them in the amounts of $71,500 and $72,000, traced on both checks the signature of Robert Ragno—who, along with Fellouris's nephew John Colombos, owned Brook Fuel—and noted on each check that it was for "return of loan and interest".

In seeking to cash the checks, Fellouris turned to Lowery, an old friend who worked as a financial advisor. In an interview with New York City Detective Manzello during the investigation, Lowery stated that during a dinner at Lowery's apartment, Fellouris had told him that he had loaned Brook Fuel approximately $127,000, which loan was still outstanding. Sometime after that dinner, Fellouris told Lowery that he would have two checks issued by Brook Fuel in the amounts of $71,500 and $72,000 in repayment of the loan plus interest, and that he intended to use the proceeds of these checks to open a restaurant with Lowery as his partner.

Defendant Kohan testified at trial that he was an attorney licensed to practice in Pennsylvania, was not yet admitted to practice in New York, but had been associated with a New York law firm where he worked on real estate and entertainment law matters. Kohan stated further that since 1978 he had promoted entertainment, theatrical, and sporting events as well.

Kohan had worked on numerous mortgage brokerage projects with Diane Acker, a "venture capitalist". Acker had introduced Kohan to Lowery approximately two years before trial in connection with a mortgage financing project. On February 25, Acker contacted Kohan to relate that a client of Lowery sought to cash two checks he was receiving in repayment of a loan for the purpose of acquiring a restaurant. Acker asked Kohan to serve as escrow agent, explaining that she and Lowery had been working on the transaction and were to receive a fee of 10%. Kohan responded that he would require written instructions in order to do the transaction.

Kohan further testified that Acker telephoned the next day to explain that an escrow agreement had been prepared and that the checks were ready to be cashed. In addition, Kohan stated that Lowery called as well to confirm the transaction and put Fellouris on the line to explain about the restaurant deal and to state that he had signed an escrow agreement.

Kohan arranged to clear the two checks through his special attorney escrow account at the Grand Central Station branch of Chemical Bank. On February 25, he met with the manager of that branch, Pat Gonsalves, and told her that "he was doing the Prince concert" and that he would be getting a large check drawn on another Chemical branch. Trial testimony indicates that Gonsalves understood Kohan to mean that he would be promoting the upcoming Prince concert.

When Kohan met with Acker the next day, she gave him the escrow agreement, executed by Fellouris, as well as the two checks. The name of the payee on each check had been left blank; Kohan filled in the payee sections to read "Jonathan Kohan, as escrow agent".

On February 27, Kohan called branch manager Gonsalves and told her he was bringing the two checks to the bank for deposit. Kohan made the deposit that afternoon, after which he called Gonsalves and asked when was the earliest time he could withdraw the proceeds in large bills. Gonsalves explained that the earliest she could provide the cash would be Friday, March 1. However, on the following day Kohan called again and said that he had to have the money that day.

After contacting David Newby, the manager of the branch at which Kohan had previously banked, to confirm that Kohan was involved in the entertainment promotions business and had conducted several large cash transactions with him, and with the Bronx branch to verify that the checks' maker had not reported any lost or stolen checks and that the central check

file department had no problem with the signatures on the checks, Gonsalves decided to give Kohan the cash earlier. Gonsalves telephoned Kohan to tell him he could pick up the cash at about 3 o'clock in the afternoon of February 28. Kohan asked Acker and Lowery to meet him at the bank at that time.

Lowery and Acker arrived at the bank before Kohan. During a conversation with Gonsalves, Lowery told her that he had given up an official position at a financial institution to become an agent, and that he had connections in the entertainment world.

When Kohan arrived, he filled out a counter check to himself in the amount of $143,500, writing in the memorandum portion "Prince concert". Upon receipt of the cash, Kohan, Lowery, and Acker left to meet with Fellouris in a nearby restaurant. There, they delivered the cash to Fellouris, and in exchange each received a payment of approximately $4,400 for helping Fellouris cash the checks.

Later that evening, Fellouris and Acker met with Thomas Moringiello, a friend Fellouris had met in prison. After Acker left, Fellouris explained that he had obtained some money from Colombos and Ragno, saying variously that he had loaned them some money and they had repaid him, and that "he finally got his revenge and ripped them off." On the morning of March 1, Moringiello called Ragno to report the conversation he had had with Fellouris the previous evening.

On March 5, Gonsalves and Newby learned that Brook Fuel was claiming that the signatures on the two Brook Fuel checks that Kohan had deposited were forged. Gonsalves immediately called Kohan and demanded that the cash be returned. Kohan said that he could not get it back, that the transaction was more complicated than he could explain, but that "whatever happens, I don't want the Prince concert mentioned". The next day Kohan met with several bank officials and explained that he got the two checks from Lowery. Kohan admitted he had misrepre-

sented the use to which the money would be put in an attempt to exaggerate his importance to bank officials.

## DISCUSSION

At the outset it is important to note that Lowery and Kohan did not contest their involvement in assisting Fellouris to cash the two Brook Fuel checks. They argued in defense, however, that they lacked the specific intent necessary to convict them of defrauding Chemical Bank. Thus, defendants' state of mind at the time the checks were cashed was the determinative factual issue at trial.

### A. *The Proffered Testimony of Lowery's Sole Witness.*

It is precisely for this reason that Lowery sought to introduce his roommate Thomas Butler's testimony at trial. Butler testified that he saw Fellouris at the apartment Butler shared with Lowery four to five times between December 1984 and February 1985. In response to the government's request for a proffer of the testimony to be elicited from Butler, Lowery's counsel explained at side bar that Butler would relate the substance of two conversations between Fellouris and Lowery in which Fellouris stated he had sold a theatrical property, had loaned the proceeds therefrom to Colombos, and that he was having difficulty getting repaid.

Furthermore, Butler would testify that when Fellouris delivered the checks to Lowery, he and Lowery discussed their nature, what they were for, and what they intended to do with the proceeds. Counsel added, "This all goes to the state of mind of Mr. Lowery that he had no knowledge that the checks were stolen." The government objected to this proffer on hearsay grounds, arguing that the testimony neither goes "to [Lowery's] state of mind" nor fits within any other exception to the hearsay rule. To this Lowery's counsel responded, "We are not suggesting hearsay. We are not offering it for the truth of the statements. We are offering it simply for the state of mind of the defendant." The

trial court sustained the objection without comment.

On appeal the government argues that the ruling was proper in light of Lowery's ambiguous proffer. We reject this argument out of hand. In the context of the record, Lowery's proffer was sufficiently specific. Government witnesses, on both direct and cross-examination, had already testified to statements by Lowery regarding his beliefs that the checks were authentic and made in repayment of a loan, and that Fellouris intended to use the proceeds to open a restaurant in partnership with Lowery. Counsel's attempt to provide the basis for those statements through Butler's testimony more resembled "fine-tuned choreography" than "risk-creating improvisation." *United States v. Paone*, 782 F.2d 386, 395 (2d Cir.1986).

■ The trial court erred in excluding Butler's testimony. Lowery was not basing his defense on the truth of Fellouris's statements, but rather on the fact that they were made and that Lowery believed them to be true. Accordingly, the proffered testimony did not fit within the definition of hearsay, *see* Fed.R.Evid. 801(c), nor, *a fortiori*, within the state of mind exception, *id.* 803(3), but instead was admissible as circumstantial evidence of Lowery's state of mind—his belief that Fellouris's activities were legitimate, *see United States v. Southland Corp.*, 760 F.2d 1366, 1376 (2d Cir.) (citations omitted), *cert. denied,* — U.S. ——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985); *United States v. Harris*, 733 F.2d 994, 1003–04 (2d Cir.1984); *United States v. Dunloy*, 584 F.2d 6, 11–12 (2d Cir.1978).

■ The government argues in the alternative that even if the trial court erred in precluding Butler's testimony, such error was harmless because the substance of that testimony had been elicited in previous testimony by government witnesses. We disagree. The government witnesses' testimony revealed arguably self-serving, *post hoc* exculpatory statements by Lowery to local and federal agents. By contrast, Butler's testimony would have recounted the *pre hoc* conversations between Fellouris

and Lowery from which Lowery concluded that Fellouris's conduct was lawful. As a result, Butler's testimony had significantly greater probative value than the agents' testimony for two reasons: first, it would have been received on Lowery's direct case rather than during cross-examination of government witnesses; and second, perhaps more importantly, Butler's testimony would have corroborated Lowery's statements to law enforcement officials, thereby helping to diminish the effect of their self-serving nature.

In addition, Lowery called no other witnesses. When an erroneous evidentiary ruling precludes or impairs the presentation of a defendant's sole means of defense, we are reluctant to deem it harmless. *See Harris*, 733 F.2d at 1005 (quoting *United States v. Carter*, 491 F.2d 625, 630 (5th Cir.1974)). In sum, we hold that the district court erred in excluding Butler's testimony, and that the error adversely affected Lowery's right to a fair trial.

### B. *Kohan's Alternative Conspiracy Defense.*

In an attempt to establish a lack of intent to defraud Chemical Bank, Kohan testified on his own behalf as to the circumstances surrounding his involvement with Fellouris. In addition, Kohan desired to show that Ragno may have plotted with Fellouris to forge the signatures on the checks so that Brook Fuel would be reimbursed by the bank while Fellouris escaped with the cash proceeds. At a side bar conference, Kohan's counsel advised the trial court that he wanted to prove this theory by questioning the government's witnesses about whether Chemical Bank had reimbursed Brook Fuel for the loss and whether Colombos and Ragno had possibly conspired with Fellouris to defraud the bank.

Kohan's counsel explained, "Anybody could have traced a signature on that check, including the principals." He stated further,

This creates the following possibility: That if he is my uncle and I want him to

go abroad and avoid his problems here in the United States, all I have to do is trace my own signature on a check, give him the check, [and] have him cash it. When he is in Morocco, [I] go to the bank and say this is not my signature. My uncle has the money and I have it back too.

\* \* \* \* \* \*

And if the company accepts less than the $148,000, the question becomes, why would they.

The trial court refused to permit counsel to question Ragno as to his possible involvement with Fellouris, ruling that Kohan could not "put in anything which is clearly prejudicial to the government if there is no proof of that, not a scintilla of proof."

On the reimbursement issue, the court ruled that whether Chemical Bank had reimbursed Brook Fuel was "irrelevant to anything this jury has to decide regarding [Kohan]." For that reason the trial court had also sustained objections to Kohan's questioning of Newby, Colombos, and Chemical Bank's counsel on the reimbursement issue.

Since district courts exercise broad discretion in making rulings on the scope of cross-examination, *United States v. Bari*, 750 F.2d 1169, 1178 (2d Cir.1984), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), and determinations of relevance, *see United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir.1986), we do not disturb an exercise of that discretion "absent a clear showing of abuse", *Bari*, 750 F.2d at 1178.

When a government witness in a criminal case is being cross-examined by the defendant, however, the trial court should allow wide latitude, *United States v. Pedroza*, 750 F.2d 187, 195 (2d Cir.1984), and the court's discretion " 'cannot be expanded to justify a curtailment [of cross-examination that] keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony' ", *id.* at 196 (quoting *Gordon v. United States*, 344 U.S.

414, 423, 73 S.Ct. 369, 375, 97 L.Ed. 447 (1953)).

The government relies on *United States v. Katsougrakis*, 715 F.2d 769 (2d Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), wherein we stated,

Although [defense] counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts.

*Id.* at 779. The government's reliance is misplaced, however, because *Katsougrakis* is readily distinguishable. There, defense counsel sought to inquire whether the government witness had mentioned in an earlier interview with a federal agent that the two arsonists hired by defendants were known as "hit men". *Id.* at 778. The "flimsy", *Pedroza*, 750 F.2d at 196, proffer made by defense counsel was that a private investigator hired by defendants suspected the arsonists were "thugs". *Katsougrakis*, 715 F.2d at 779.

Here, by contrast, Kohan's counsel based his proffer on previously admitted testimony that provided circumstantial evidence sufficient to support Kohan's conspiracy theory of defense and to allow him to present it to the jury.

The testimony of Kohan, Moringiello, Detective Manzello, FBI Agent Shubert, and others is replete with references to a loan Fellouris had made to Brook Fuel and to two checks that were allegedly in repayment of that loan. Moreover, Moringiello telephoned Ragno the day after the checks were cashed to inform him that Fellouris had said "you fellows repaid him a loan and/or he ripped you off. Are you fellows missing a substantial sum of money? \* \* I'm talking about $140,000." Ragno, in response, said, "No way we could be missing $140,000", and took no action to check the status of the company's account at Chemical Bank.

When Moringiello met Fellouris at the airport later that morning and told him of

the phone call to Ragno, Fellouris simply responded that the principals of Brook Fuel were stupid and would not even know the money was missing. Additionally, the missing page of Brook Fuel checks that Fellouris had stolen on February 26 went undetected until discovered by Colombos on Monday, March 4, when, after further inquiry, it was also discovered that two unauthorized checks in the amounts of $71,500 and $72,000 had been drawn on the company's account. Finally, Brook Fuel settled its claim against Chemical Bank for wrongful payment on those checks for an undisclosed amount, presumably less than full reimbursement. Kohan's counsel argues persuasively that if the settlement amount is substantially less than the claimed loss, the company's willingness to accept such an amount might be further proof of a collusive scheme between it and Fellouris.

 We conclude, therefore, that Kohan's proposed cross-examination concerning Brook Fuel's possible involvement with Fellouris and reimbursement by Chemical Bank was not "prejudicial hypothesis", but rather was relevant to the case and sufficiently supported in the record. A jury that was presented through effective cross-examination with the facts stated above might very well be left with a reasonable doubt as to whether Kohan intended to conspire with Fellouris, Acker, and Lowery to defraud Chemical Bank. Indeed, if Kohan's theory is correct, the jury might well conclude that Brook Fuel, in conspiring with Fellouris, authorized the traced signatures of Ragno appearing on the Brook Fuel checks, that the checks were, therefore, not forged, and that Chemical Bank was justified in cashing the checks. In that event, Kohan's alleged fraud would be set in a much different light, and the verdict might well be different.

Accordingly, we hold that the trial judge abused her discretion both in limiting the scope of Kohan's cross-examinations in this regard and in deeming the reimbursement issue irrelevant to Kohan's defense.

## CONCLUSION

Our disposition of defendants' appeals renders unnecessary any discussion of Kohan's further arguments that the trial court erred in refusing a contemporaneous limiting instruction on Lowery's interlocking confession and in permitting the government to cross-examine Kohan regarding corporate officers indicating their representative capacities when signing corporate checks.

Reversed and remanded for a new trial.