UNITED STATES of America, Plaintiff-Appellee,

v.

Jose Oscar CANTU, Defendant-Appellant.

No. 88–2530.

United States Court of Appeals, Fifth Circuit.

June 23, 1989.

Marjorie A. Meyers, Roland Dahlin, Federal Public Defender, Houston, Tex., for defendant-appellant.

Paula Offenhauser, Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before REAVLEY and POLITZ, Circuit Judges, and HUNTER,* District Judge.

POLITZ, Circuit Judge:

Jose Oscar Cantu appeals his conviction by a jury of conspiracy to import in excess of 100 grams of heroin, 21 U.S.C. § 963, two counts of importing heroin, 21 U.S.C. § 952(a), conspiracy to distribute in excess of 100 grams of heroin, 21 U.S.C. § 846, and two counts of possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1). Cantu contends that the court erred by excluding statements made to him by a government informant which he proposed to offer in support of his defense of entrapment. Cantu also claims prosecutorial misconduct in the examination of witnesses and in closing argument. For the reasons assigned, we reverse and remand.

*Background*

Raul Santander and Juan Manuel Renteria worked with the Drug Enforcement Administration (DEA) as paid confidential informants. Renteria testified as a government witness at Cantu's trial. Santander was not called to testify because he was incarcerated in Mexico at the time of trial. The government witnesses testified to the following scenario.

Renteria met Cantu in Reynosa, Mexico in early December of 1987. Renteria and Santander were driving their car down the street when Cantu signaled them that their engine was smoking. Cantu offered to supply Renteria with 12 ounces of heroin, and Renteria responded that he would talk "with the people." Telephone numbers were exchanged. After this meeting Renteria met DEA agent Mario Alvarez at an apartment in McAllen, Texas, where it was decided that Renteria would arrange a sale with Cantu.

On December 12 or 13, 1987, Renteria returned to Reynosa to secure a sample of heroin from Cantu. Cantu suggested that the sale take place in McAllen, Texas at a stereo store owned by his brother. Cantu indicated that a person identified only as "the Commander" would bring the drugs over the border. The price of the heroin sample was agreed to at $250–$300. Renteria communicated this information to

---

* District Judge of the Western District of Louisi- ana, sitting by designation.

agent Alvarez. Renteria next spoke with Cantu when he returned a telephone call Cantu had placed and Cantu informed him of the date and place of the sale of the heroin sample. That information was relayed to Alvarez.

The meeting took place on December 14, 1987 at the stereo store in McAllen. Renteria introduced agents Alvarez and Leo Silva to Cantu. The agents posed as drug buyers. Cantu gave Alvarez a packet containing what tested to be 1.54 grams of 18% heroin hydrochloride and received $300. Cantu quoted a price of $6,000 per ounce and Alvarez responded that future buys would depend on the quality of the heroin and that Renteria would be in touch with him.

The government witnesses further testified that Cantu telephoned Renteria a few days later to inquire about the buyers' reaction to the sample. On December 17, 1987 Renteria accompanied Cantu to Monterrey, Mexico to meet "the Commander," who reportedly could supply substantial quantities of heroin and cocaine. Cantu, Renteria and "the Commander" met that evening and discussed a transaction involving 50 kilograms of cocaine and 5 kilograms of heroin. This information was relayed to Alvarez the following day.

Renteria testified that on the morning of December 22, 1987 Cantu called and advised that the heroin was available. Renteria met Cantu for breakfast after which they repaired to the stereo shop and Cantu showed Renteria where the heroin was hidden in a hole in the ground. Renteria contacted Alvarez. A short time later agent Silva, accompanied by agent Anastacio Castaneda posing as a drug buyer, arrived at the stereo store. Negotiations took place in Renteria's vehicle. Silva asked Cantu if he had the heroin. Cantu responded affirmatively and produced a packet of heroin and a knife to cut a sample. The price was agreed to and the arrest signal was given. The packet contained 164.9 grams of 20% heroin hydrochloride.

Cantu intended to testify and offer a defense of entrapment. On the second day of trial the government filed a motion *in limine* asking the court "to prohibit all defense counsel and all defense witnesses from making any statements or arguments regarding, or raising any questions regarding, or behavior which might be attributed to Raul Sentender [sic], an individual who has not testified in this action, and who will not be called as a witness by the United States." The government also requested that the court "prohibit all defense counsel and witnesses from asking any questions, giving any responses, or making any argument or statement with reference to the following: (A) The decision of the United States not to subpoena, call or produce Mr. Raul Santender [sic]." The court granted this motion over Cantu's objection.

Cantu made the following proffer for the record: He met Santander, known to him as Miguel Montemayor, in Reynosa when his car broke down and Santander offered him a ride home; they went to a restaurant where Santander offered to sell him cocaine and marihuana; Cantu demurred and Santander asked Cantu to locate a "client" for him; Santander drove Cantu to his mother's home, returning there on several occasions in an attempt to persuade Cantu to secure customers for him; Santander made similar repeated requests over the telephone; Santander introduced Cantu to Renteria who also tried to get Cantu to make contact with customers; Santander wanted Cantu's help because "Christmas was coming and he [Santander] didn't want to spend it without money"; and a woman named Juanita, frequently present with Santander, provided the sample Cantu sold to agent Alvarez.

At trial Cantu testified at length, including some of the statements contained in his proffer, but he could not testify about Santander's alleged persistence in trying to get him to secure customers for his illicit drug activities. That testimony was disallowed as hearsay. The trial court reasoned:

> [I]n order to show [Cantu's] state of mind you have to prove the truth that all these statements were being made. And whether they were being made is really

important—whether they were being truthfully made is really important....

[W]hether he was really being harassed, and all these other things is important. And it does become important to test their veracity and whether they were actually made, and there's no way to test that.

And there's a big incentive on the part of the defendant to make these statements, and to say that these things were said, and there's no way to test that.

So, the trustworthiness bothers this Court.

### Analysis

#### 1. Hearsay

■ The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). If the significance of a statement "lies solely in the fact that it was made," rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not offered to prove the truth of the matter asserted. *See United States v. Bobo*, 586 F.2d 355 (5th Cir.1978) (citing Advisory Committee Note to Rule 801(c)), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed. 2d 795 (1979).

■ Cantu, claiming an entrapment defense, offered Santander's statements as evidence of his inducement by the government to commit a crime. The defense of entrapment requires evidence of government inducement to act criminally and a lack of predisposition to engage in criminal conduct prior to contact with the government's agents. *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *United States v. Jones*, 839 F.2d 1041 (5th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct.1999, 100 L.Ed.2d 230 (1988). Santander's statements were offered as evidence of Cantu's state of mind, bearing directly on his entrapment defense. Thus, the significance of the statements lies solely in the fact that they were made; the truth of the statements is irrelevant for

that purpose. The trial court erred in concluding that the proffered statements were hearsay.

As we understand the proffer and Cantu's explanation, he sought to testify about Santander's persistence and his efforts to resist Santander's blandishments. The statements Santander allegedly made were not offered to prove that Santander really wanted Cantu to get drug customers but, rather, to prove that he made the statements. The statements were not offered as an assertion of a fact but, rather, as the fact of an assertion. As such the statements were not hearsay. *See United States v. Goodwin*, 625 F.2d 693 (5th Cir. 1980); *United States v. Rubin*, 591 F.2d 278 (5th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979); *see also United States v. Kohan*, 806 F.2d 18 (2d Cir.1986).

The trial court's concern over the trustworthiness of Cantu's testimony was misplaced. Cantu's credibility, like the testimony of any witness, was subject to the crucible of cross-examination and was within the exclusive province of the jury. The veracity of a claim that certain statements were made was subject to evaluation like any other testimony presented at trial. That evaluation was for the jury. *See Dutton v. Evans*, 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) ("The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements."); *see also United States v. Parry*, 649 F.2d 292 (5th Cir. 1981); *United States v. Carter*, 491 F.2d 625 (5th Cir.1974).

The trial court's erroneous exclusion of statements made by Santander deprived Cantu of a critical element of his entrapment defense. Cantu was unable to offer his explanation to the jury, for whatever credit the jury might have assessed, that Santander initiated the subject of drugs during their first encounter and persistently harassed him to find buyers thereafter. Moreover, the restriction on Cantu's testimony arguably caused it to lack coherence and continuity. The error was not harm-

less. *See Rubin*, 591 F.2d 278; *United States v. Herrera*, 600 F.2d 502 (5th Cir. 1979); *Carter*, 491 F.2d 625; *see also Kohan*, 806 F.2d 18.

2. Prosecutorial misconduct

 As an independent grounds for reversal Cantu cites repeated acts he characterizes as prosecutorial misconduct. Cantu contends that the prosecutor: (1) made unfounded allegations of witness intimidation; (2) raised the spectre of Cantu's guilt through his rumored association with a suspected drug dealer; (3) suggested that Cantu had committed similar offenses in the past; and (4) during closing argument expressed his personal opinion concerning the credibility of the government's witnesses and the strength of the government's case, and distorted the burden of proof.

Cantu's first three allegations of prosecutorial misconduct did not prejudicially affect his substantial rights and do not constitute reversible error. It is not necessary to reach the question of their propriety. The comments in closing argument, however, were inappropriate.[1] The prosecutor may not express a personal opinion concerning the merits of a case, or the credibility of witnesses, *United States v. Morris*, 568 F.2d 396 (5th Cir.1978), or misstate the jury's function or the burden of proof, *United States v. Vargas*, 583 F.2d 380 (7th Cir.1978). We are confident that on retrial they will not be repeated.

The convictions are REVERSED and the matter is REMANDED for retrial.

---

1. The prosecutor's closing argument included the following statements:

 [Cantu] admitted that he even had information that a person by the name of Juana was going to bring it across and give it to him. I believe there was such a person, but I don't believe the name was Juanita.

 He also mentions the fact that there was a meeting with Miguel Montemayor. I believe that there was a person whose name was Miguel Montemayor. When the defendant was caught and when he was taken to DEA he came up with the story to try to save himself.

\* \* \* \* \* \*

And Agent Alvarez told you that he discussed the price with that man. If you want to find him not guilty, ladies and gentlemen, you're going to have to find that Mr. Renteria lied. That Agent Alvarez lied. That Agent Silva lied. That Agent Castenada lied.

They are right here in the courtroom. There's Agent Castenada, and Agent Silva. Here's Agent Alvarez. Tell me. Not guilty. You didn't do a good job, and you trapped this guy. That's what you do when you tell them not guilty.