**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony J. NATALE,
Defendant-Appellant.**

No. 84–1699.

United States Court of Appeals,
Fifth Circuit.

June 20, 1985.

Rehearing Denied Aug. 20, 1985.

Anthony J. Natale, pro se.

Kerry P. FitzGerald, Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., Christopher Lee Milner, Dallas, Tex., for plaintiff-appellee.

Before BROWN, POLITZ and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Anthony J. Natale and codefendants, George Malina and Albert Wash, were charged in a two-count indictment arising out of the use of strong-arm tactics to collect an alleged debt. Natale, Malina and Wash were charged in Count I with conspiracy to collect an extension of credit by extortionate means, in violation of 18 U.S.C. § 894, and in Count II with the use of extortionate means to attempt to collect an extension of credit, in violation of 18 U.S.C. § 894 and 2. After a joint jury trial, Natale was acquitted on Count I but found guilty on Count II; Malina and Wash were acquitted on both counts. The district court imposed a sentence on Natale of five years, with the condition that he be confined for a period of six months with the remainder of the term to be served on probation, and a fine of $5,000.

Natale challenges his conviction on the grounds that there was insufficient evidence to establish that an extension of credit was made, and that the district court's supplemental instruction to the jury was not responsive to the jury's question. We have reviewed each of Natale's arguments, and for the reasons we explain in detail below, affirm his conviction.

## I

Gary Barnhart was the owner and operator of the English Garage, a business engaging in the repair and restoration of imported classic automobiles such as Jaguars and Rolls Royces. In April of 1983, Natale, one of Barnhart's customers, discussed with Barnhart the possibility of restoring a 1955 Aston Martin owned by Barnhart. Natale told Barnhart of an acquaintance, Jim Graham, who could provide Barnhart with the capital needed for the restoration. Sometime later, Barnhart entered an unwritten business agreement with Natale pursuant to which Graham advanced $8,000 to Barnhart; in exchange Barnhart agreed to give Graham half the profit from the sale of the car. Natale received a $2,000 fee from Barnhart for his services.

Barnhart and Natale entered into a similar arrangement regarding two Jaguars that Barnhart had purchased in May 1983. Under the terms of the agreement Barnhart received $10,000 from Graham to repair the two Jaguars. The transaction was again conducted through Natale who received a second fee of $1,000.

Natale and Barnhart met frequently over the next several months, discussing the restoration of the automobiles. Natale, however, became concerned that the restoration was progressing too slowly and on October 25, 1983, Natale wrote Barnhart, stating:

> I can no longer tolerate the situation with the phantom Aston Martin, & the two Jags. I need my money back & the $1000 you promised for advancing the money on the first deal. *If this does not happen in 10 days*, the $ back or the cars produced plus their [unencumbered] titles then I will very swiftly come down on you with the full weight of the law .... (Emphasis added.)

Natale sent a second demand letter to Barnhart on November 1, which stated: "This is my second written attempt to elicit a response from you—in addition to many phone calls. I want the money paid you for two Jaguars and one Aston Martin ...."

On November 7, 1983, Natale filed a criminal complaint with the Dallas County District Attorney. The complaint stated the terms of the joint venture agreement, and charged that Barnhart had not complied with the agreement. The district attorney declined to take any action and advised Natale to pursue the action in civil court.

By March 1984 the automobiles still had not been restored, and Natale had not received a refund of the money that Graham had invested in the cars. Natale then informed Barnhart that Graham was getting impatient, and that if Barnhart did not refund the money very quickly, Graham's "axe squad" would attempt the collection. Natale also told Barnhart that he knew of a man who was put in the trunk of his car with a bullet in his head for failing to repay Graham.

In the meantime, Barnhart was contemplating the sale of his business for reasons not directly related to the Graham debt. Barnhart and Natale discussed on several occasions during March the sale of Barnhart's business to a Mr. Gilbert, another acquaintance of Natale. Natale was apparently acting as a middleman, and Barnhart provided Natale with financial statements regarding the business's operations, financial position, and the European companies Barnhart used in connection with importing the automobiles. The proposed sales agreement, pursuant to an understanding with Natale, also provided for the repayment of the Graham loan as a condition of the sale.

Natale and Barnhart arranged a meeting on March 30, 1984 at the Amore Restaurant in Dallas to discuss further the plans regarding the sale of Barnhart's business. When Barnhart arrived at the restaurant, Natale was already seated at a table; two men, later identified as codefendants Malina and Wash, were seated at an adjoining table. Barnhart joined Natale who asked him if he had brought the money that Barnhart owed Graham. When Barnhart replied that he had not, Natale said that he was "sorry for what's about to happen." Wash and Malina then came over to Natale and Barnhart. Wash put one arm around Barnhart's shoulder and held a revolver against Barnhart's ribs. Malina then instructed Barnhart to bring the money in cash back to the restaurant on the following Tuesday (April 3).

Worried, and apparently having difficulty coming up with the money, Barnhart spoke to Natale on the telephone on Sunday, April 1. During their conversation, Natale assured Barnhart that if Barnhart raised the money, Wash and Malina would not harm him. Although Barnhart attempted to raise the money to pay Graham, by Tuesday, April 3 he had only raised approximately $2,800. On the afternoon of April 3, Barnhart went to the Federal Bureau of Investigation for assistance.

FBI agents wired Barnhart with a tape recorder and instructed him to meet with Wash and Malina as planned. Barnhart then went to the restaurant where he met Wash and Malina who asked Barnhart if he had brought the money. When Barnhart replied that he did not have it all, Wash and Malina told Barnhart that if he saw Natale, he should tell Natale that he had been beaten for not paying the full amount. At the conclusion of the meeting, Wash and Malina were arrested.

Later, Natale was arrested. All three defendants were then indicted by a federal grand jury sitting in Dallas, Texas, on April 10, 1984, for a single count of conspiring to participate in the use of extortionate means in an attempt to collect an extension of credit in violation of 18 U.S.C. § 894. A two-count superseding indictment was returned June 19, 1985. In Count I, Natale, Malina and Wash were charged with conspiring to collect an extension of credit by extortionate means, and in Count II, with the use of extortionate means to collect an extension of credit, in violation of 18 U.S.C. § 894 and 2. As previously stated, only Natale was found guilty, and only on Count II. This appeal followed.

## II

The issues in this case focus on the language of the statute. Natale was convicted under 18 U.S.C. § 894 which provides:

Whoever knowingly participates in any way, or conspires to do so, in the use of extortionate means

(1) to collect or attempt to collect any extension of credit or

(2) to punish any person for the non repayment thereof,

Shall be fined not more than $10,000 or imprisoned not more than twenty years or both.

Natale contends that the evidence is insufficient to sustain his conviction in violation of 18 U.S.C. § 894, since the government failed to prove that there was an "extension of credit." Natale argues that there are two ways in which a transaction can be an extension of credit. First, there must be a loan, or second, there must be an agreement whereby the repayment or satisfaction of a debt or claim will be deferred. Natale asserts that the evidence established only that the transaction here was in the nature of an investment or joint venture, and not in the nature of a loan or an extension of credit. He argues that the testimony of his witnesses supports his characterization of the transaction.

In considering whether there is sufficient evidence to sustain a conviction, we must determine whether a reasonable trier of fact could have found that the evidence establishes guilt beyond a reasonable doubt. *United States v. Loalza-Vasquez,* 735 F.2d 153 (5th Cir.1984); *United States v. Bell,* 678 F.2d 547 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In applying this standard, we must consider the evidence, direct and circumstantial, in the light most favorable to the government. We also must accept all reasonable inferences which tend to support the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Marx,* 635 F.2d 436 (5th Cir.1981).

■ We begin our consideration by noting again the statutory language. The term "to extend credit" is defined in 18 U.S.C. § 891(a)(1) as follows:

To extend credit means to make or renew a loan, or to enter into an agreement, tacit or express, whereby the repayment or satisfaction of debt or claim whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

As applied to our facts, the definition of an extension of credit may be simplified to mean: to enter into *any* agreement whereby the satisfaction of *any* claim will be deferred.

We agree with Natale that the evidence indicates that the original agreement of the parties was in the nature of an "investment" or "joint venture." The interpretation of the initial agreement does not, however, resolve the question of whether there was an "extension of credit." In order to resolve the issue, we must first determine whether there was a "claim" regardless of the legal right for such a claim, and, second, whether there was an agreement to defer the payment of the claim. We conclude that the evidence establishes both elements necessary to find that there was an extension of credit.

First, the evidence shows the "claim" on the part of Natale arose once Barnhart failed to repair the automobiles in accordance with the earlier agreement; the nature of the arrangement had changed, at least as far as Natale was concerned. The evidence introduced at trial supporting this conclusion are the two written demands dated October 25 and November 1, 1983, for the repayment of the money previously advanced to Barnhart by Natale. These demands clearly indicate that Natale no longer viewed the arrangement as a joint venture with the sharing of profits, but as an "advance" for which repayment forthwith was required.

There was also an agreement to defer the payment. Natale agreed to a ten-day extension of credit in his letter dated October 25; thereafter Natale repeatedly made oral demands that Barnhart *repay* the money and agreed to defer collection. This deferral agreement occurred when, *inter alia,* Natale informed Barnhart in late March that if Barnhart did not repay the loan "quickly" (an unspecified time period for which payment was deferred), an "axe squad" would coerce payment. An agreement to defer occurred again when Barnhart initially met Natale, Malina and Wash at the Amore Restaurant and was given

until the following week to repay the amount owed Graham.

Thus, notwithstanding the testimony of Natale and his witnesses that there was only a joint venture between the parties, the evidence is clearly sufficient for the jury properly to have inferred that Natale considered the transaction to be an advance which required repayment, and that Natale agreed to defer the payment on this advance. The jury is entitled to credit the actions of the defendant over the defendant's characterization of the transaction.

We therefore hold that when the evidence is viewed in the light most favorable to the government, it is clear that there was sufficient evidence for the jury to find that there was an extension of credit.[1]

The result we reach today is consistent with the First Circuit's opinion in *United States v. Sedlak,* 720 F.2d 715 (1st Cir. 1983), *cert. denied* — U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). In *Sedlak,* the defendant similarly argued on appeal that there was insufficient evidence to establish that there was an extension of credit. Sedlak first argued that the original business arrangement was a "bailment" and not a loan, and second, that there was not a valid debt, since the debt was extinguished when he took possession of White's furniture in satisfaction of the debt. The First Circuit rejected each of Sedlak's arguments. It held that the fact that Sedlak had later instituted a civil suit to collect the debt, and the fact that Sedlak continued to refer to the money that White owed him, constituted sufficient evidence for the jury to conclude that an extension of credit in the form of a loan existed *at the time the extortionate acts occurred,* a particularly sharp observation as applied to our case.

### III

Natale's second argument is that the district court committed reversible error when it submitted a supplemental jury instruction in response to a question submitted by the jury. Natale argues that the district court's reply was not responsive to the jury's question, did not adequately refer to the previous instructions, and was not a correct statement of the law.

While deliberating, the jury sent the following note to the trial court: "If we the jury see that this was an investment and not a loan, does this void all charges?" The district court responded: "In addition to the instruction defining extension of credit previously given to you, you are further instructed that an extension of credit may result if an indebtedness arises through a person's misappropriation of funds invested in a partnership or joint venture."

Natale argues that the supplemental instruction was not responsive to the jury's question since neither he nor the government contended that Barnhart had misappropriated funds invested in a partnership. The trial transcript indicates, however, that in the opening argument, Natale's attorney stated that Natale and Barnhart had entered into a "joint venture," and that Barnhart "used the Federal Government to try to steal the money that Anthony Natale gave him." The same theory was reiterated by Natale's attorney at closing argument. The standard of review applied when evaluating supplemental instructions is whether, when viewing the original and supplemental as a whole, the jury misunderstood the issue presented to it. *See United States v. Bent,* 707 F.2d 1190, 1195 (11th Cir.1983); *United States v. Nickerson,* 669 F.2d 1016, 1021 (5th Cir. 1982). The district court instructed the jury that to extend credit is "to make or renew any loan or to enter into any agreement, tacit or expressed, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed,

---

**1.** A conviction under section 894 requires that extortionate means be used for the collection of an extension of credit. Natale did not argue on appeal that extortionate means were not used, only that there was insufficient evidence to establish an extension of credit. Having rejected his argument that there was no extension of credit, it is clear that the elements to sustain a conviction under 18 U.S.C. § 894 are present.

valid or invalid, and however arising, may or will be deferred." After considering the original and supplemental instructions, we find that the district court's supplemental instruction was responsive to the jury's question.

Natale next argues that the supplemental instruction was erroneous since it did not adequately refer to the original instructions. Natale asserts that the supplemental instruction should have specifically referred back to the definition of an extension of credit. He argues that his case is analogous to *United States v. Carter*, 491 F.2d 625 (5th Cir.1974).

In *Carter*, the jury requested a supplemental instruction on circumstantial evidence. The trial court repeated the circumstantial evidence instruction previously given, and then gave two illustrations of how circumstantial evidence could be used to establish guilt. On appeal, we reversed the conviction since the supplemental instruction reemphasized that portion of the instructions favorable to the government, without mentioning the part favorable to the accused, and reversed the conviction. We stated: "When the jury requests further instructions on points which are favorable to the government, the trial judge should repeat instructions favorable to the defense where the requested instructions taken alone might leave an erroneous impression in the minds of the jury," citing *Bland v. United States*, 299 F.2d 105, 108 (5th Cir.1962).

The same argument advanced in *Carter* and *Bland* was advanced by the defendant in *United States v. Hawes*, 529 F.2d 472 (5th Cir.1976). We held in *Hawes* that there was no reversible error because the trial court instructed the jury to consider the original instructions along with the supplemental instructions, and because the court re-explained the necessary elements of the offense. Similarly, in *United States v. Fuiman*, 546 F.2d 1155 (5th Cir.1977), although we stated that the supplemental instructions did not contain a complete reiteration of the government's burden of proof and the defendant's presumption of innocence, we held that the supplemental instructions were adequate since they were carefully constructed to avoid favoring either party.

We have carefully reviewed the trial court's supplemental instruction, and hold that the district court committed no error here. First, the court specifically informed the jury that during deliberations they were to consider the original instructions as well as the supplemental instruction. Second, the instruction did not indicate in any manner whether the court considered Natale guilty or innocent. Because the court's response was carefully constructed to avoid favoring either side, we do not feel that it was required to redefine the term "an extension of credit."

Natale's final attack on the jury instruction is that the district court improperly enlarged the law when it stated that an "extension of credit" may occur when funds are misappropriated from a partnership. We reject this argument. We stated in *United States v. Totaro*, 550 F.2d 957 (4th Cir.1977) that an indebtedness arising from the misappropriation of partnership funds is an extension of credit within the meaning of section 891(a), citing *United States v. Annerino*, 495 F.2d 1159 (7th Cir.1974). Although *Totaro* and *Annerino* are factually distinguishable, the principle of law enunciated in those cases is correct, and applies with equal force to the case before us. Accordingly, we hold that the district court did not enlarge the law when it gave the supplemental instruction.

IV

We have carefully reviewed the arguments raised by Natale but have not been persuaded by any of them. Accordingly, the conviction of Natale is

AFFIRMED.