**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry Jerome STOKES, Murrell Adams,
and John Willie Anderson,
Defendants–Appellants.**

**No. 90–1905.**

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1991.

---

Thomas L. Kesler, Columbus, Miss. (Court-appointed), for Stokes.

Jim Waide, Tupelo, Miss. (Court-appointed), for Adams.

Charles D. Easley, Jr. (Court-appointed), and James A. Walters, Jr. (for presentation of oral argument only), Columbus, Miss., for Anderson.

Charles W. Spillers, Asst. U.S. Atty. and Robert Q. Whitwell, U.S. Atty., Oxford, Miss., for the U.S.

Before REAVLEY, POLITZ and DUHÉ, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants Larry Jerome Stokes, Murrell M. Adams and John Willie Anderson were convicted of using and conspiring to use threats of violence to collect an extension of credit in violation of 18 U.S.C. section 894. They appeal their convictions, challenging the applicability of section 894 to the facts of this case, and the sufficiency of evidence to prove an extension of credit. These appellants were wrongdoers, but they were prosecuted in the wrong court. They were guilty of no federal offense; we reverse the convictions.

## I. BACKGROUND

Defendant Larry Stokes did construction work for a living. Ronnie Richardson owned a wrecker business and developed real estate. In August 1988, Richardson asked Stokes to build a road base, and the two men entered into a written contract under which Stokes was to be paid as the contract was fulfilled. Richardson became impatient with Stokes' progress. Early in November 1988, after some negotiation, Richardson cancelled the contract with Stokes.

Stokes promptly sent Richardson a bill for $4,158.11 for the work performed. Richardson did not pay. Stokes himself approached Richardson about six months later demanding payment. Richardson stalled.

In July 1989, Stokes hired a lawyer, Douglas Dalrymple, to try to collect from Richardson. Dalrymple sent Richardson a letter in July 1989 attempting to collect Stokes' claim. Dalrymple also discussed with Stokes the possibility of obtaining a lien against Richardson's property. But Stokes did not file a lawsuit against Richardson.

Instead, Stokes devised an alternate plan to make Richardson pay. On the morning of December 19, 1989, Stokes called four of his employees, Murrell Adams, Kevin Johnson, John Anderson and Adam Gurley, into his office and told them about his plan.

Richardson owned a heavy-duty wrecker truck, and Stokes wanted to take possession of it and assert a lien against it. Stokes' plan was for Anderson to call Richardson at Richardson's business, Richardson Towing and Recovery. Anderson would tell Richardson that Anderson had a truck in need of towing. Johnson would then drive Anderson to meet Richardson at a convenience store. Anderson and Richardson, in Richardson's truck, would follow Johnson ostensibly to the location of Anderson's disabled truck. In fact, Johnson was to lead Richardson back to the yard of Stokes Excavation Company. Once Richardson was in the yard, Adams and Gurley were to block Richardson's wrecker in the yard with two of Stokes' dump trucks.

Stokes' plan, as formulated and told to these employees on December 19, had a further aim. Stokes also wanted to "shake up" Richardson to make him pay. During the planning meeting, Stokes gave

Anderson his knife. He told Anderson to use the knife to scare Richardson if necessary. Johnson and Gurley had shotguns because they had been hunting on the morning of December 19, and Stokes told Johnson and Gurley that they could use the shotguns to scare Richardson. He told them that it was all right to fire the shotguns in the air, even indoors through the roof of the office, to scare Richardson.

Around 1:00 p.m. on December 19, Richardson met Anderson and Johnson as planned, and the group proceeded to the yard of the Stokes Company. Richardson became suspicious when he saw the Stokes Company name on some of the equipment in the yard. He told Anderson that he thought something was not right, and he was being set up. Anderson then engaged and locked the air brakes on Richardson's wrecker. Richardson reached for his two-way radio, and Anderson grabbed his arm. A struggle ensued, during which Anderson displayed the knife that Stokes gave him. Meanwhile, Adams and Gurley positioned their trucks.

Anderson ordered Richardson out of the wrecker, and Richardson complied. Anderson and Richardson went into Stokes' office, followed by Johnson, Gurley and Adams. Stokes demanded five thousand dollars from Richardson "right then." When Richardson refused, Stokes threatened to "whip" Richardson. Stokes produced a handwritten document prepared some time in advance of the meeting. The document states, "I, Ronnie Richardson, agree to leave my wrecker in the possision [sic] of Larry Stokes until my bill of $5,000 is paid in full." Stokes told or asked Richardson to sign the document. Richardson refused. Anderson commented that the men should take Richardson out back and do something to make him "come around." Gurley audibly worked the action of a pump shotgun.

Richardson signed the document. Anderson, Johnson and Gurley signed as witnesses. Adams had left the room, and was absent when the signing took place. Stokes then warned Richardson that he had a buyer for the truck that day. He told

Richardson to get the $5,000. Richardson testified that Stokes said Richardson "wouldn't see the light of day" until he got the money.

Stokes suggested Richardson could have his wife or father bring the money. Richardson said that was impossible. Richardson testified someone threatened again to take him outside and make him cooperate, but could not recall who made this threat. Either Stokes or Richardson suggested Richardson could borrow the money from the bank. Stokes allowed Richardson to call one Robert Lamar, a representative of Richardson's bank, to obtain a loan. Lamar told Richardson to come to the bank.

Under Stokes' orders, Johnson drove Richardson to the bank with Adams riding along. Anderson and Gurley followed in another truck. Anderson still had Stokes' knife. Anderson and Gurley also carried a shotgun. On the way to the bank, Adams advised Richardson that Stokes was "crazy" and would hurt or kill Richardson if he did not cooperate.

Upon arrival, Adams and Richardson went inside the bank while Johnson waited outside. As soon as Richardson was able to speak with Lamar, he told Lamar that he was being kidnapped and needed the police. The police arrived and arrested Adams in the bank. They arrested Johnson, Gurley and Anderson outside, and seized the shotgun and knife. The police went to Stokes Excavation Company where they found and arrested Stokes, who surrendered the document that Richardson had signed.

The government charged Stokes, Adams, Anderson, Gurley and Johnson in count one with using and conspiring to use extortionate means to collect an extension of credit, in violation of 18 U.S.C. section 894; in count two with conspiracy to violate 18 U.S.C. section 894; in count three with conspiracy to use extortion to affect interstate commerce in violation of 18 U.S.C. section 1951; in count four with violation of 18 U.S.C. section 1951; and in counts five and six with carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. section 924(c)(1). The government voluntarily dis-

missed counts three, four and six before trial. The government deferred prosecution of all charges against Johnson and Gurley under a pretrial diversion agreement, subject to their testifying at trial against Stokes, Adams and Anderson.

The case was tried to a jury before the Honorable L.T. Senter, Jr., commencing on April 23, 1990. Following a four-day trial, the jury found Stokes, Adams and Anderson guilty of counts one and two, and not guilty of count five. The district court sentenced the defendants to terms of imprisonment totalling sixty months for Stokes, twelve months for Adams, and twenty-four months for Anderson. All of these terms required downward departure from the federal sentencing guidelines.

## II. DISCUSSION

Congress has made it a crime to participate knowingly, or conspire to participate "in any way ... in the use of any extortionate means ... to collect or attempt to collect any extension of credit." 18 U.S.C. section 894(a)(1). And,

> [t]o extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

*Id.*, section 891(1).

■ Appellants contend that section 894 does not apply to ordinary commercial transactions. We disagree. Congress meant section 894 to apply primarily to loansharking by organized crime, but did not draft the statute to proscribe only loansharking. The statute does not require proof of loansharking, organized crime, or an underlying criminal transaction. Section 894 applies to extortionate credit transactions as a class of activities. *United States v. Roberts*, 546 F.2d 596, 598 (5th Cir.), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977).

This court has applied section 894 in a commercial context with no nexus between the extension of credit and either organized crime or other underlying illegal activity. *United States v. Natale*, 764 F.2d 1042, 1044–46 (5th Cir.1985). In doing so, we noted that "extension of credit," as defined in section 891(1), could be simplified to read, "to enter into *any* agreement whereby the satisfaction of *any* claim will be deferred." *Id.*, 764 F.2d at 1045 (emphasis in original).

Appellants contend there was no evidence of an extension of credit within the meaning of section 894, and therefore no fact issue existed for the jury. Under the definition of extension of credit that is required by section 891(1), we agree there was no evidence of an extension of credit.

■ Section 891(1) defines an extension of credit as either a loan, or an agreement to defer payment of a debt or claim. There being no contention that Stokes made a loan to Richardson, the government had to prove an agreement to defer payment of a debt or claim.[1] The debt or claim could be invalid or unacknowledged, and the agreement could be tacit or express.

---

1. The courts are not agreed on the showing necessary to prove an agreement to defer payment. *United States v. DiPasquale*, 740 F.2d 1282, 1287 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985), on which the trial court relied, found sufficient under section 894 an indictment that charged the defendant with using extortion "to collect and attempt to collect a claimed debt ...," without reference to any extension of credit or agreement to defer. *Id.* at 1287.

Contrary to the holding in *DiPasquale*, many courts require proof of an assent to deferral by the creditor. These courts typically find that such assent may be proved by minimal conduct. *See United States v. Traitz*, 871 F.2d 368, 388 (3d Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989) (despite *DiPasquale*, agree-ment to defer was a necessary element, but could be inferred from a policy allowing union members to defer payment of a fee until the end of the month); *United States v. Lopez*, 803 F.2d 969, 974–75 (9th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987) (agreement to accept bad checks until funds were deposited); *United States v. Brinkman*, 739 F.2d 977, 983 & n. 5 (4th Cir.1984) (express agreement to defer recovery of royalty payments pending financial recovery of payor); *United States v. McMahan*, 744 F.2d 647, 650 (8th Cir.1984) (agreement to accept check with subsequent extortion to collect when check bounced); *United States v. Czarnecki*, 552 F.2d 698, 703 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977) (agreement to pay off bet at conclusion of horse race); *United*

The district court apparently thought that an attempt to collect a claimed debt suffices to prove an attempt to collect an extension of credit. The court found this interpretation of section 891(1) in *DiPasquale,* which said in so many words that an extension of credit could be proved by the mere presentment of a demand for payment of a debt or claim. "[A] claimed debt is one type of extension of credit...." *Id.,* 740 F.2d at 1288.

But the Seventh Circuit in *Boulahanis,* 677 F.2d at 590–91, held that section 894 does not penalize every extortionate collection practice, and that proof of some manifestation by the creditor of his assent to defer, however minimal, burdens the government's case. *DiPasquale* expressly rejected this holding and required only proof of a demand for payment to establish an extension of credit. *Id.,* 740 F.2d at 1288.[2] We agree with the Seventh Circuit's interpretation.

Section 891(1) by its plain terms requires an "agreement" to defer payment. A section 891(1) agreement is not an ordinary, bilateral agreement. To require a bilateral agreement to defer, necessarily implying bilateral agreement to the debt, would negate the statutory language encompassing invalid or unacknowledged debts.

But the statute does say "agreement," and we think this requires, at a minimum, proof of conduct by the creditor manifesting assent to defer payment. This accords with our previous decision speaking to this point. *See Natale,* 764 F.2d at 1045–46 (requiring proof of an "agreement to defer" and finding multiple expressions thereof by the creditor).

No evidence was presented of this essential element of an agreement to defer payment. Defendant Stokes never indicated to Richardson that Richardson could have more time to pay the construction debt. Stokes' conduct toward Richardson consistently manifested Stokes' demand for immediate payment. Stokes sent someone to collect after Richardson cancelled the contract. Later, Stokes demanded payment personally. Stokes contacted a lawyer, who wrote Richardson a letter attempting to collect. Stokes discussed with his lawyer the possibility of obtaining a lien against Richardson's property.

As part of the extortionate collection attempt, Stokes did in fact seize Richardson's truck, and threaten Richardson to obtain immediate, not deferred payment. Stokes even threatened not to release Richardson until Richardson paid. Only after Richardson convinced Stokes that Richardson could not produce the money without leaving Stokes' office did Stokes release Richardson, but then he did so only in the custody of two of his men, and only on the understanding that Richardson would go immediately to the bank and obtain the money.

The document Richardson signed in Stokes' office did not express Stokes' assent to defer payment. Stokes had possession of the truck at that time, and indicated his intent to sell it that day to obtain the $5,000 if Richardson could not otherwise produce the money. The truck was Stokes' conditional payment, and the document was a memorialization of his putative interest in it. The document did not contain an expression of assent to deferred payment.

Nor do we think the original construction contract implied an agreement to defer payment. The contract made payment due on completion of specified stages of work. No payment was due before completion, and no credit terms were supplied. Stokes asserted his claim regularly and periodically without any conduct tending to show his willingness to allow Richardson slack.

The judgments of conviction are REVERSED. The three appellants are acquitted and discharged.

**2.** Some courts said *DiPasquale* effectively read the "agreement" requirement out of the statute.

*See, e.g., United States v. Goode,* 750 F.Supp. 1079, 1082–83 (D.Utah 1990) (thoroughly analyzing the agreement element of section 891(1)).