United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 13, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-60312
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

MALCOLM CHARLES HARTZOG

Defendant-Appellant

_____

Appeal from the United States District Court
for the Southern District of Mississippi
No. 2:04-CR-00022-LG-2
_____

Before KING, STEWART, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Malcolm Charles Hartzog was convicted of conspiring to distribute cocaine hydrochloride and cocaine base and possession with intent to distribute cocaine hydrochloride. He was sentenced to a term of life imprisonment for the conspiracy conviction and a term of 360 months for the possession conviction. Hartzog appeals to this court, seeking reversal of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

his conviction and sentence.  For the reasons stated below, we AFFIRM.

## I.  BACKGROUND

Malcolm Charles Hartzog ("Hartzog") was charged on August 26, 2004, in three counts of a four-count superseding indictment. Only two of these counts are relevant to this appeal.  The first relevant count ("count one") charged Hartzog with conspiring to distribute more than 150 kilograms of cocaine hydrochloride and more than 1.5 kilograms of cocaine base ("crack"), in violation of 21 U.S.C. §§ 841(a)(1) and 846.  The second relevant count ("count three") charged Hartzog and defendant Jackie Newsome ("Newsome") with possession with intent to distribute more than 100 grams but less than 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  On September 21, 2004, Hartzog moved to dismiss the indictment pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161 et seq., and he filed an amended version of this motion on October 1, 2004. The district court denied both motions.

Hartzog's trial began on November 29, 2004.  The government did not produce any physical evidence of the drugs described in the indictment, but relied instead on the credibility of testimony from cooperating witnesses, confidential informants, and investigating agents to prove its case.  Among these witnesses, Hartzog's fellow defendant Newsome, Mississippi Bureau

2

of Narcotics ("MBN") agent Marcus Bass ("Bass"), and cooperating witness Gregory James ("James") provided testimony highly relevant to this appeal.

James, a cocaine dealer, testified that he began secretly cooperating with MBN agents after his second arrest, in September 2003. James began by naming both Newsome and Hartzog as his suppliers. On October 24, 2003, MBN agents, including Bass, arranged for James to meet Newsome to conduct a controlled buy. In order to monitor this controlled buy, the MBN agents outfitted James with a transmitter and searched him in advance for drugs on his person. James testified that he met with Newsome, followed Newsome to a remote area, and then gave Newsome a sum of money. Shortly thereafter, Hartzog drove past both James and Newsome and was identified by James. According to Newsome's testimony at Hartzog's trial, he then left with James's money, called Hartzog, met with Hartzog, and returned to James with cocaine provided by Hartzog. When James returned to the MBN agents, he turned over approximately 124.9 grams of cocaine hydrochloride.

In addition to their testimony about this controlled buy, both James and Newsome provided considerable general testimony about Hartzog's drug trafficking activities. At Hartzog's trial, James testified that he first met Hartzog in 2002, during a drug transaction with Newsome. According to James's testimony, he received nine to eighteen ounces of powder cocaine from Newsome

3

and Hartzog once a week.[1]  James also testified that he arranged two multi-kilogram cocaine transactions between Hartzog, Newsome, and a group of "Texans" in the summer of 2003.

Newsome's testimony reinforced James's account.  At Hartzog's trial, Newsome testified that he dealt drugs with Hartzog until his own arrest in February 2004.  More specifically, Newsome testified to Hartzog's role in delivering cocaine to transactions with James.  At the conclusion of Newsome's direct testimony, Hartzog's counsel moved to be provided with unredacted copies of various agent-prepared investigative reports, known as DEA-6s, in order to impeach Newsome's testimony and the testimony of other prosecution witnesses.

Hartzog's counsel claimed that the government was required to disclose the reports pursuant to the Jencks Act, 18 U.S.C. § 3500, because the reports constituted "statements," as defined by the Jencks Act, made by Newsome and other prosecution witnesses.  In response, the government argued that the DEA-6 reports were not witness "statements" as defined by the Jencks Act because each report was prepared by an agent rather than a witness and contained only the agent's recollection of the interview.  The district court examined the DEA-6 reports and

_____

[1]  James testified that Hartzog was present at "[m]ainly every one" of his drug transactions with Newsome, and that during these purchases, he saw Hartzog give the drugs to Newsome, who would then give the drugs to James in exchange for money.

4

denied Hartzog's Jencks Act motion. Following Newsome's cross examination, the government introduced several other cooperating witnesses who testified about various cocaine transactions involving Hartzog.

After the government rested, Hartzog called Special Agent Karl Winter ("Winter") to the stand in order to challenge the testimony of some of the government's witnesses, based on the content of the DEA-6 reports Winter had written. Hartzog then took the stand in his own defense. Hartzog testified that he was not involved in the controlled buy of October 24, 2003, and he denied engaging in any drug transactions with any of the co-conspirators named in the indictment.

Following the government's rebuttal evidence, the district court instructed the jury, and both sides presented their closing arguments. During their deliberations, the jurors sent a note to the district judge asking: "Do we have to be unanimous on [the] amount [of drugs]?" The district court replied: "Yes." Shortly thereafter, the jury foreperson sent a second note, which stated: "I believe we will be unable to agree unanimously on the amount."

The district court then called the jury foreperson to discuss the verdict form. The foreperson informed the district court that the jury had reached unanimity on the first and fourth questions of the special verdict form, which dealt with Hartzog's guilt or innocence on the conspiracy and possession with intent to distribute charges. The foreperson also informed the district

court that the jury was unable to reach unanimity on the second and third questions of the special verdict form, which required the jury to determine what quantities of cocaine hydrochloride and crack Hartzog had conspired to distribute. Both the second and third questions allowed the jurors to select "none" as a response. After this exchange, the district court simply instructed the jury to return to its deliberations. Over two hours later, the jury unanimously found Hartzog guilty of the conspiracy and possession counts of the indictment discussed above. The jury also found that Hartzog's conspiracy conduct involved less than 500 grams of cocaine hydrochloride and more than fifty grams of crack.

On March 7, 2005, the district court sentenced Hartzog to a term of life imprisonment and a term of 360 months for the possession conviction. Hartzog filed a motion for a new trial and a motion for judgment notwithstanding the verdict on March 9, 2005. The district court denied both motions the following day. On April 12, 2005, Hartzog filed a notice of appeal to this court, challenging the jury verdict and seeking relief from his conviction and sentence.

## II. DISCUSSION

### A. Hartzog's Jencks Act Claim

Hartzog raises two claims in this appeal based on the Jencks Act. First, he claims that the Jencks Act required Hartzog's

prosecutors to disclose unredacted versions of the DEA-6 reports because these reports contained information provided by cooperating witnesses that could have been used for impeachment purposes.  To support his claim that these DEA-6 reports constituted "statements" as defined by 18 U.S.C. § 3500(e), Hartzog points out that the government referred to them as statements during his trial.  Second, Hartzog claims that the district court erred in denying his objection without conducting an in camera review to determine if the DEA-6 reports contained "statements," as defined by the Jencks Act.  To support this second claim, Hartzog refers to our opinion in United States v. Conroy, 589 F.2d 1258, 1272-73 (5th Cir. 1979), in which we vacated and remanded a trial court's judgment based on that court's failure to examine material allegedly covered by the Jencks Act.

In response, the government contends that Hartzog has failed to show that the DEA-6 reports were witness "statements" as defined by § 3500(e), because Hartzog has not made a showing that the reports were ever read or adopted by the witnesses.  The government also claims that Conroy is inapposite because the district court in this matter, unlike the court in Conroy, actually examined the DEA-6 reports before denying Hartzog's motion.

We review the district court's determination that a DEA-6 report did "not constitute a 'statement' requiring disclosure

7

under the Jencks Act for clear error." United States v. Brown, 303 F.3d 582, 591 (5th Cir. 2002); see also United States v. Durham, 587 F.2d 799, 802 (5th Cir. 1979) ("We will not overturn a trial court's ruling that reports are not statements under the Jencks Act unless that finding is clearly erroneous."). Moreover, even when the government is found to have violated the Jencks Act, that failure is subject to harmless error analysis. See United States v. Martinez, 151 F.3d 384, 391 (5th Cir. 1998) (finding no indication that a Jencks Act violation occurred, but quoting United States v. Beasley, 576 F.2d 626, 629 (5th Cir. 1978), and "reiterat[ing] this circuit's holding" that "'the harmless error doctrine must be strictly applied in Jencks Act cases'").

Hartzog's first claim is misplaced; the DEA-6 reports are not "statements" as defined by the Jencks Act. The Jencks Act defines the term "statement" thusly:

> The term "statement," as used in . . . this section in relation to any witness called by the United States, means--
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). We have applied this provision and held that in order for "interview notes" such as the DEA-6 reports at

8

issue in this appeal "to qualify as a statement under § 3500(e)(1) the witness must have signed, read, or heard the entire document read." United States v. Pierce, 893 F.2d 669, 675 (5th Cir. 1990) (citing United States v. Hogan, 763 F.2d 697, 704 (5th Cir. 1985)). The witnesses did not sign or otherwise verify these DEA-6 reports. Moreover, we have held in the past that "DEA-6 reports are not verbatim accounts" but are rather "'short, concise, summaries of the witnesses' version of the facts as recounted to the agents.'" United States v. Weintraub, 871 F.2d 1257, 1260 (5th Cir. 1989) (quoting United States v. Merida, 765 F.2d 1205, 1215 (5th Cir. 1985)). Hartzog has not shown that the DEA-6 reports at issue in this appeal depart from the norm and provide substantially verbatim accounts of the witnesses' version of the facts. Because Hartzog has failed to show that the DEA-6 reports qualify as statements under the Jencks Act, he has failed to show that a violation of the Jencks Act occurred.

Hartzog's second claim is also misplaced because Conroy is inapposite. In Conroy, the trial court completely failed to review any of the documents at issue and relied entirely on the government's assertions. See 589 F.2d at 1273 (stating that "where the court fails even to look at the complete materials, thereby abdicating its responsibility to government counsel, the reviewing court has no choice but to vacate the judgment and remand for an appropriate examination"). In contrast, the

9

district court in this matter reviewed the redacted DEA-6 reports and made specific findings that the reports did not contain "statements" as defined by the Jencks Act. Because the district court carefully reviewed the DEA-6 reports before denying Hartzog's Jencks Act motion, Hartzog has failed to show that the district court's failure to hold an in camera review was reversible error.

**B.    Hartzog's <u>Brady</u> Claim**

Hartzog also claims that the district court's failure to disclose the unredacted DEA-6 reports violated his due process rights established by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). The <u>Brady</u> rule, which requires the government to disclose evidence favorable to the accused and material to guilt or to punishment, also "encompasses evidence concerning the reliability of a witness that may be determinative of guilt or innocence." <u>United States v. Garcia</u>, 917 F.2d 1370, 1375 (5th Cir. 1990) (citing <u>Giglio</u>, 405 U.S. at 154). Hartzog now claims that the government's failure to disclose the unredacted DEA-6 reports deprived him of potentially exculpatory impeachment evidence.

In response, the government argues that Hartzog failed to establish a sufficient record for our review of this <u>Brady</u> claim because he did not ask the district court to include the unredacted DEA-6 reports in the record. In addition, the

10

government argues that Hartzog has failed to demonstrate that any of the withheld information would have made a material difference to his defense. See, e.g., United States v. Lowder, 148 F.3d 548, 551 (5th Cir. 1998) (rejecting Brady claims because, even assuming that the government withheld potential impeachment evidence, the evidence was immaterial as the government's case "consisted of testimony from numerous witnesses").

We review "allegations of Brady violations de novo." United States v. Infante, 404 F.3d 376, 386 (5th Cir. 2005). To prevail on a Brady claim, a defendant such as Hartzog must satisfy a three-part test: "(1) the prosecution did not disclose evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material--i.e., there is a reasonable probability that if the government had disclosed the evidence, the result of the proceeding would have been different." Infante, 404 F.3d at 386. This reasonable probability has been defined as "a probability sufficient to undermine confidence in the outcome." United States v. Holley, 23 F.3d 902, 914 (5th Cir. 1994) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

We have reviewed the redacted reports, and we conclude that the withheld information is non-material. Virtually all of the redacted information relates to witness identity: for the most part, only the names of certain informants have been redacted; in a few instances, additional identifying information such as

11

addresses or phone numbers have also been redacted. "We fail to see how access" to these minor omissions "could have been of any real value" to Hartzog's defense, "even for impeachment purposes." United States v. Sink, 586 F.2d 1041, 1051 (5th Cir. 1998). Accordingly, we hold that Hartzog's Brady claim is without merit.

**C.   Hartzog's Speedy Trial Act Claim**

Hartzog also claims that the district court erred in failing to dismiss this case pursuant to the Speedy Trial Act, 18 U.S.C. § 3161. In this appeal, Hartzog claims that his prosecution involved two separate violations of the Speedy Trial Act. First, Hartzog argues that his prosecution violated the Speedy Trial Act because over thirty days elapsed between the filing of the criminal complaint on June 21, 2004, and the filing of the superseding indictment on August 26, 2004. Hartzog also argues that the district court erred in granting the government a continuance. He claims that this error caused over seventy days to elapse between the filing of the complaint and the commencement of his trial, which also violated the Speedy Trial Act.

The government responds by arguing that Hartzog's claims fail to account for the specific exceptions which served to toll the time limitations of the Speedy Trial Act in this case. First, the government argues that the filing of the initial

indictment on June 23, 2004, tolled the thirty day arrest-to-indictment clock. Citing this court's decision in United States v. Perez, 217 F.3d 323, 329 (5th Cir. 2000), the government points out that although the superseding indictment increased the drug quantities alleged, both the original and superseding indictments charged the same offenses, and therefore no violation of the Speedy Trial Act occurred. Second, the government points out that even without considering the district court's September 8, 2004, order granting a continuance, Hartzog's trial still occurred within the seventy-day limit set forth by the Speedy Trial Act, because the district court properly excluded several time periods based on motions filed by Hartzog.

The Speedy Trial Act requires that an "indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). When, as here, the government files a superseding indictment based on the same criminal transaction, and the superseding indictment is filed more than thirty days after the defendant's arrest, the filing of the original indictment tolls the thirty-day limit set forth in the statute. Perez, 217 F.3d at 328-29. Therefore, the district court correctly declined to dismiss the superseding indictment based on the Speedy Trial Act.

13

The Speedy Trial Act also requires that "the trial of a defendant . . . shall commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). However, several "periods of delay" are "excluded . . . in computing the time within which the trial of any such offense must commence[,]" including a "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion . . . ." 18 U.S.C. § 3161(h), (h)(1)(F). We have held that "[o]bviously any pretrial motion leveled at dismissing th[e] indictment counts as excludable time under 18 U.S.C. § 3161(h)(1)(F)." United States v. Castellano, 848 F.2d 63, 65 (5th Cir. 1988). Here, as in Castellano, there was no violation of the seventy-day time limit of the Speedy Trial Act because the district court properly excluded several periods for delay when it considered Hartzog's pretrial motions.

**D. Hartzog's Remaining Claims**

**1. Hartzog's Verdict Form Claim**

Hartzog claims that the district court's special verdict form allowed the jury to consider quantities of cocaine that conflicted with the quantities charged in the conspiracy count of the indictment. He also claims that the district court failed to

14

require the jury to find the drug quanties beyond a reasonable doubt. Hartzog concludes that these alleged errors require reversal based on our holdings in United States v. Randle, 259 F.3d 319 (5th Cir. 2001), withdrawn and superseded on reh'g, 304 F.3d 373 (5th Cir. 2002), and United States v. Burton, 237 F.3d 490 (5th Cir. 2000) (per curiam).

Hartzog's conclusion is incorrect because the district court's jury instruction was consistent with the guidelines provided in FIFTH CIRCUIT PATTERN JURY INSTRUCTION (Criminal) § 2.89 and expressly approved by this court in United States v. Arnold, 416 F.3d 349, 356 (5th Cir. 2005) (stating that "[t]his approach --using a special interrogatory to determine drug quantity--is endorsed in the note to Fifth Circuit Pattern Instruction § 2.89, and we find its use appropriate"). Furthermore, Randle and Burton, the cases relied upon by Hartzog, are inapposite. In Randle, "the district judge did not instruct the jury to determine the quantity of crack cocaine" for which the defendant was responsible. 259 F.3d at 320. Similarly, in Burton, "the quantity of cocaine base possessed with intent to distribute . . . was neither charged in the indictment nor proven to the jury beyond a reasonable doubt." 237 F.3d at 491. In contrast, the district court in this matter submitted the drug quantity to the jury, and the jury reached conclusions beyond a reasonable doubt on the quantity issue using the verdict form. Therefore, the verdict form does not require reversal.

15

## 2. Hartzog's Drug Quantity Claim

Hartzog also claims that the district judge's responses to the jury's questions and the district judge's exchanges with the jury's foreperson require reversal. More specifically, Hartzog argues that because the district judge did not reiterate that "none" was an option on the drug quantity issue--even though "none" was clearly provided as an option in the written instruction--the conviction should be reversed.

In general, district courts enjoy "wide latitude in deciding how to respond to questions from a jury . . . ." United States v. Cantu, 185 F.3d 298, 305-06 (5th Cir. 1999). The district court's straightforward exchange with the jury in this case fits well within the acceptable latitude established by our precedent. Moreover, the very case Hartzog relies upon, United States v. Natale, 764 F.2d 1042 (5th Cir. 1985), actually undercuts his position. In Natale, we rejected a defendant's argument that a supplemental jury instruction was erroneous because it did not adequately refer to the original instruction. Instead, we held that the trial court's "response was carefully constructed to avoid favoring either side," and we declined to require the trial court to "redefine" a term appearing in the original instruction. Natale, 764 F.2d at 1047. As in Natale, the district court in this matter provided a carefully constructed, neutral response that did not favor either side, and it was not required to

16

redefine or reiterate a term which appeared in the original instruction.

### 3. Hartzog's Beyond a Reasonable Doubt Claim

Hartzog argues, without legal citation, that the district court violated his due process rights by instructing the jury that proof beyond a reasonable doubt "is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your affairs." Hartzog failed to object to this reasonable doubt instruction at trial, so we review this claim for plain error. Hartzog has not demonstrated any error, much less plain error, as the district court's instruction was taken directly from the FIFTH CIRCUIT PATTERN JURY INSTRUCTION (Criminal) § 1.05.

### 4. Hartzog's Sufficiency of the Evidence Claim

Hartzog also argues that the record was insufficient to convict him of conspiracy to distribute cocaine. To support this argument, he claims that the prosecution's witnesses were not credible, and he also points to the lack of physical evidence to support their testimony. We "review the evidence to determine whether 'a rational jury could have found the essential elements of the offenses beyond a reasonable doubt.'" United States v. Pompa, 434 F.3d 800, 806 (5th Cir. 2005) (quoting United States v. Dean, 59 F.3d 1479, 1484 (5th Cir. 1995)). In the course of this review, we "draw[] all reasonable inferences in favor of the

17

jury's verdict." United States v. Alix, 86 F.3d 429, 435–36 (5th Cir. 1996). Moreover, we will not consider Hartzog's credibility argument on appeal: "'[c]redibility issues are for the finder of fact and do not undermine the sufficiency of the evidence.'" Martinez, 151 F.3d at 389 (quoting United States v. Morgan, 117 F.3d 849, 854 n.2 (5th Cir. 1997)).

Hartzog is also incorrect that the jury's verdict is insupportable because of the lack of physical evidence. Physical evidence is not required for a narcotics conviction, and we have held that even the testimony of a single witness "was in itself sufficient to convict" a defendant of similar crimes. United States v. Ramirez, 145 F.3d 345, 351 (5th Cir. 1998); see also United States v. Westbrook, 119 F.3d 1176, 1190 (5th Cir. 1997) (upholding a verdict based on the testimony of co-conspirators even though police did not find the defendant in possession of crack). As in Westbrook, the jury's guilty verdict in this matter is supported by "voluminous" testimony, and we decline to disturb it.

### 5. Hartzog's Sentencing Claim

Finally, Hartzog raises two sentencing issues. First, he contends that the district court erred by reaching a different fact finding conclusion on the drug quantity issue than the jury, thereby violating his Sixth Amendment rights under United States v. Booker, 543 U.S. 220 (2005). Second, Hartzog argues that the

18

district court erred in applying a four-level sentencing enhancement under the U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 (2004) [hereinafter U.S.S.G.]. Hartzog argues that this enhancement also violated Booker's standard because the district court judge, rather than the jury, made the findings necessary to support the enhancement.[2]

Hartzog's first sentencing argument--that the district court erred by adjusting his sentence based on facts neither admitted by him nor proven beyond a reasonable doubt to the jury--is incorrect. As we recently explained, the sentencing guideline range "'should be determined in the same manner as before Booker/Fanfan' and . . . a judge may still find all the facts supporting a sentence." United States v. Duhon, 440 F.3d 711, 715-16 (5th Cir. 2006) (quoting United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005)); see also United States v. Alonzo, 435 F.3d 551, 553 (5th Cir. 2006) (stating that, "[c]ontrary to [the

---

[2] In his brief, Harztog also discusses the retroactivity of Booker and the district court's use of his prior convictions to enhance his sentence. It is not clear whether he intends to challenge his sentence on these grounds; regardless, both claims are foreclosed by Supreme Court and circuit precedent. See Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998) (treating the fact of a prior conviction as a permissible sentencing factor that need not be admitted by the defendant or found by the jury beyond a reasonable doubt); United States v. Alfaro, 408 F.3d 204, 211 (5th Cir. 2005) (noting post-Booker that "Almendarez-Torres has not been overruled and is still good law"); United States v. Austin, 432 F.3d 598, 599 (5th Cir. 2005) (concluding that there was no ex post facto problem with the district court's application of the remedial holding of Booker at sentencing).

defendant's] argument, 'Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing'") (quoting Mares, 402 F.3d at 519). Therefore, the district court acted within the confines of Booker when it determined that the evidence presented against Hartzog supported the drug quantities alleged in the indictments.

Hartzog's second sentencing argument is similarly misplaced. U.S.S.G. § 3B1.1(a) instructs a sentencing court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." We review a "district court's determination that a defendant was a leader or organizer under U.S.S.G. § 3B1.1(a) [as] a factual finding . . . for clear error." United States v. Villanueva, 408 F.3d 193, 204 (5th Cir. 2005). The testimony submitted at trial indicated that Hartzog was the primary supplier of substantial quantities of cocaine for over five individuals; therefore, the district court's sentencing enhancement under § 3B1.1 was not error, much less plain error.

### III. CONCLUSION

For the reasons stated above, Hartzog's conviction and sentence are AFFIRMED.